Sarabeth M. **DAVIS**, Robert S. **Borders**, Victor Maron, Irving Berke, and Adele E. Conrad, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 02–746X.

United States Court of Federal Claims.

Sept. 15, 2006.

Laurie M. Erickson, Huntington Beach, California, with whom was Darryl R. Wold, Tustin, California, Of Counsel, for Plaintiffs.

Steven D. Bryant, with whom were Trial Attorneys Elsie B. Kappler and Kelle S. Acock, Agency Counsel Major Kevin Robitaille and Major Patrick Gray, and Assistant Attorney General Thomas Sansonetti, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for Defendant.

1. Chief Judge Edward J. Damich designated Judge Thomas C. Wheeler as the Hearing Officer in this case on July 7, 2006.

## REPORT OF THE HEARING OFFICER

WHEELER, Hearing Officer.[1]

In this Congressional reference case, Plaintiffs claim that they were injured by actions of the United States in attempting to sell their Partnership's property in Los Alamitos, California. A prospective buyer of Plaintiffs' property, the Grace Church, was unable to obtain a conditional use permit from the City of Los Alamitos, and the proposed sale did not occur. Plaintiffs allege that a Department of the Army document entitled "Final Report/Air Installation Compatible Use Zone Study/Armed Forces Reserve Center/Los Alamitos Army Airfield," dated December 1989 ("1989 AICUZ Study" or "Study"), caused the City of Los Alamitos to deny the conditional use permit, and that Plaintiffs thereby suffered damages in excess of $21 million. Plaintiffs claim that the 1989 AICUZ Study was not prepared in accordance with applicable regulations, and that the Study caused unfounded public safety concerns stemming from the proximity of Plaintiffs' property to a military airfield. Defendant has filed a motion for summary judgment focusing principally on a lack of any causation, and Plaintiffs have opposed Defendant's motion. The Hearing Officer has considered all submissions from the parties in the preparation of this report.

For the reasons stated below, the Hearing Officer finds that the actions of the United States did not cause the City of Los Alamitos to deny Grace Church's application for a conditional use permit. The City independently recognized obvious public safety concerns from locating a church near a military airfield. The City had other significant concerns, such as the impact of church ownership on the City's tax revenue base, the lack of adequate parking, the lack of an adequate setback from the rear property line, the lack of compatibility with adjacent industrial and residential uses, and the impact of noise and fumes from the base and airfield. Moreover, the City Council knew that Plaintiffs' property was located near the airfield before the Army issued the 1989 AICUZ Study. To the

extent that the Los Alamitos City Council considered the 1989 AICUZ Study in denying the conditional use permit, the Study was not misleading or inaccurate. Rather, the Study correctly indicated that Plaintiffs' property was near the "crash zone" or "clear zone"[2] of the airfield's runways. Plaintiffs too, knew that the property was located near a military airfield when they originally acquired it in 1976. Casting further doubt on Plaintiffs' causation argument is the fact that Plaintiffs received offers from other prospective buyers between 1989 and 1995. Therefore, without a legal or equitable basis for recommending relief, the award of any money to Plaintiffs would constitute a gratuity.

## I. *Findings of Fact*[3]

1. The Plaintiffs in this action were partners of Los Caballeros Center, a partnership formed under the laws of California ("the Partnership"). Compl. ¶ 5. Sarabeth Davis and Robert Borders were general partners. Deposition of Sarabeth Davis, March 10, 2004 ("Davis Dep.") at 28–29. The other Plaintiffs, Victor Maron, Irving Berke, and Adele Conrad, were limited partners. *Id.*

2. In February 1976, the Partnership purchased approximately 8.9 acres of undeveloped property located at 5252 Katella Avenue and 11021–11132 Winners Circle in the City of Los Alamitos, California ("the Property"). Compl. ¶ 6. The Partnership thereafter developed the Property to include a bank, a restaurant, two office buildings and six office-industrial buildings. Compl. ¶ 7.

3. The Property is adjacent to the Los Alamitos Armed Forces Reserve Center ("AFRC" or "the Base"). Compl. ¶ 6. The AFRC includes the Los Alamitos Army Airfield on a portion of the Base, separated from the Partnership's property by a golf course that is also located on the Base. *Id.*

4. The Partnership commenced discussions with Grace Church, Los Alamitos, California, regarding the possible purchase of the Property a few months prior to November 1989. Defendant's Proposed Findings of Uncontroverted Fact (Deft's PFOF), ¶ 4. Robert D. Kingsbury served as Executive Pastor and Treasurer of Grace Church. *Id.* The Partnership did not formally list the Property with a real estate agent in 1989, though it entertained multiple offers for the purchase of the Property that year. *Id.*

5. On November 6, 1989, the Partnership, through its accountant, submitted to Grace Church a document signed by the general partners entitled "Agreement for the Purchase of Real Property" which referred to the purchase of eight of the ten buildings (excluding the bank and the restaurant) for a price of $11,500,000 and the assumption by the buyer of a loan to Union Mutual for approximately $2,616,000. App. Exh. 1 at 2–8.[4] Grace Church did not sign this document. *Id.*

6. On November 16, 1989, Grace Church sent a letter to the Partnership's accountant offering to purchase the Property, including the bank and the restaurant, for a price of $13,700,000. App. Exh. 3 at 12. This offer contemplated a purchase price of $10,000,000 for eight of the ten buildings and an additional $3,700,000, in the form of an option for the remaining portion of the property. *Id.* Grace Church indicated in this letter that its offer was contingent upon receiving a conditional use permit ("CUP") from the City of Los Alamitos. *Id.*

7. By letter dated December 11, 1989, the Partnership authorized Grace Church to apply for the CUP. App. Exh. 7 at 31. On the same day, Grace Church applied to the City of Los Alamitos for a CUP for the two office-

**2.** "Crash zone" and "clear zone" are synonymous terms used by the Army to describe areas near or within the takeoff and landing patterns at the airfield's runways.

**3.** These Findings of Fact are based upon the parties' Statements of Uncontroverted Fact submitted in support of Defendant's Motion for Summary Judgment, and Plaintiff's Opposition thereto. Some of the Findings of Fact are from documents furnished with supplemental filings

received from the parties. The material facts are not in dispute.

**4.** On May 10, 2004, the parties submitted a stipulation regarding the authenticity and admissibility of certain documents supporting Defendant's motion for summary judgment. The parties assembled the documents in an Appendix with exhibit numbers. These documents will be referred to herein as "App. Exh. — at ——."

industrial buildings closest to the AFRC, and also submitted an "Environmental Information Form." App. Exh. 5–6 at 24, 28.

8. On January 15, 1990, the staff of the City of Los Alamitos Planning Commission issued a report recommending denial of Grace Church's application for a CUP. App. Exh. 11 at 91–95. Among the issues identified by the staff were the inadequacy of parking, incompatibility with the AFRC, and the proximity of the site to the Base's crash hazard or clear zone, the effects of church noise on neighboring residential areas, the incongruity of the church with the site design and surrounding land uses, the negative impact of the proposed use on the tax revenue base of the City, and the possibility that a church might discourage the location of other revenue producing businesses on adjacent industrial properties. *Id.* The staff recommendation stated as follows:

> Relocation of a church to 11131 and 11132 Winners Circle will have negative impacts on surrounding uses and the City's financial base. The proposed land use is incompatible with adjacent existing residences and permitted industrial/manufacturing' businesses. It is, therefore, recommended that the Planning Commission deny Conditional Use Permit No. 329–89 based on the findings in this report and the attached Draft Resolution.

*Id.* at 95.

9. On January 15, 1990, the City's Planning Commission held a public hearing to consider Grace Church's CUP application. App. Exh. 13 at 101–11. The Planning Commission members discussed many of the points addressed in the Planning Commission's report, and heard comments from the public, including Rev. Kingsbury, Mr. Borders, and Ms. Davis, among others. *Id.* The minutes of the hearing reflect discussion of the proximity of the property to the Base's crash hazard zone, parking location and capacity, set-back issues, noise, seismic considerations, the negative impact on the City's tax revenue, and the disincentives on other uses in the industrial park. *Id.* The Planning Commission denied the CUP application, with four members voting for denial and one member abstaining. *Id.* at 110.

10. On January 29, 1990, Lt. Col. William J. Davies of the California Army National Guard furnished to the City Manager of Los Alamitos a copy of the 1989 AICUZ Study. Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Pltfs' Opp.") Exh. C. The letter from Lt. Col. Davies explained:

> The attached AICUZ is an update of information included in the Airfield Master Plan of 1984. However, you will notice some change to noise contours and no change to clear zones and accidental potential zones.
>
> This study will assist your city and developers in planning projects that may be impacted with the operation of the airfield.

*Id.*

11. The 1989 AICUZ Study explained that the mission of the Los Alamitos Army Airfield is to provide airfield support for the AFRC. The airfield operates seven days per week, 15 hours per day (7:00 AM–10:00 PM), with a maximum of 113,000 annual aircraft operations. Actual data for 1987–1989 showed between 30,000 and 54,000 annual takeoffs and landings. The resident fleet at the airfield as of August 1989 consisted of approximately 100 helicopters and two fixed-wing aircraft. The airfield also accommodated military aircraft flying in from other facilities. Pltfs' Opp. Exh. J at 14–18. In the Summary of Flight Operations for 1987, Table 6.2–1, the report indicates that the UH–1 helicopter accounted for 87.4 percent of operations. *Id.*

12. According to the 1989 AICUZ Study, the airfield has two active runways. Runway 22L/4R is a fully instrumented Class B runway, 8,000 feet long and 200 feet wide, capable of supporting all Department of Defense and commercial transport aircraft. Runway 22R/4L is a Class A runway, 5,900 feet long and 150 feet wide, intended for small light aircraft. Pltfs' Opp. Exh. J at 29.

13. The shorter, Class A runway had a clear zone width of 1,000 feet, and the longer, Class B runway had a clear zone width of 3,000 feet, measured from the runway centerline. Pltfs' Opp. Exh. J at 5. The Class A runway was closest to the Partnership Property. Charts contained in the 1989 AICUZ

Study showed Plaintiffs' Property to be within Noise Zone II, 65–75dB(A), *id.* Exh. J, Figure 6.2–1, and just outside the clear zone for Runway 22L/4R, Figure 6.3–1, and for Runway 22R/4L, *id.* Figure 6.3–2.

14. On January 29, 1990, Grace Church requested a hearing before the City Council to appeal the Planning Commission's January 15, 1990 CUP denial. App. Exh. 17 at 116.

15. On February 1, 1990, the City Clerk of Los Alamitos issued notice to neighbors and the general public of a public hearing to be held on February 12, 1990 before the City Counsel to consider the City Planning Commission's denial of Grace Church's CUP application. App. Exh. 18, 19 at 117–20.

16. On February 2, 1990, Los Caballeros Center, through its counsel, wrote to Robert Dunek, the City Manager of Los Alamitos. The letter stated: "[i]t is my understanding, from those who attended the [January 15, 1990] public hearing, that the loss of sales tax revenues was the primary, if not the exclusive, basis for denial raised at the hearing, although several other items not discussed, or minimally discussed, appear in the Resolution." App. Exh. 20 at 123. The letter concluded as follows:

> It should ... be recognized that some courts have expressed the view that, although increase in tax revenues may be a proper zoning objective, denial of a use merely because it is exempt or non-revenue bearing (such as a church) is improper. We hope you will bring this information to the attention of the Council before the hearing on appeal. It seems that there is a serious misconception as to the revenue producing qualities of the subject property, in addition to the propriety of using such a standard to deny use by a tax exempt entity.

*Id.* at 124. This letter did not expressly mention the Army's 1989 AICUZ Study, or the proximity of the property to the Base.

17. On February 5, 1990, the Los Alamitos Planning Commission held a regular meeting to reconsider the Planning Commission's denial of Grace Church's CUP application. App. Exh. 21, 22 at 125–31. The Planning Commission voted to adopt the resolution with four votes in favor and one abstention. App. Exh. 23 at 132–34. Resolution No. P.C. 519–89, denying the CUP application, contained the following six findings:

(1) The intent and purpose of the P–M, Planned Light Industrial District, as set forth in Section 22–15 of the Zoning Code, is to provide appropriate areas for light industrial uses and related activities and to promote the concentration of such uses in a manner which will foster mutually beneficial relationships with each other, as well as with those areas of the City zoned for other development. The regulation of uses and standards of development set forth in the P–M Zone are those deemed necessary to provide the proper environment for the efficient and desirable use of this type of industrial land, and to provide the proper safeguards to protect nearby residential, commercial and public uses.

(2) The location and character of the proposed use, if operated according to the plan and conditions imposed, will not be in harmony with the area in which it is located, and will not be in conformance with the Los Alamitos General Plan in that the use is inconsistent with the purpose clause set forth in one (1) above.

(3) The use may endanger the public health or safety if located where proposed because the church facility will be impacted by noise and hazards created by operations at the adjacent Armed Forces Reserve Center. A high occupancy use at this location, such as the proposed 725–seat church and assembly hall/classroom building, may jeopardize the safety of the building occupants because the facility is situated in very close proximity to the Los Alamitos Army Airfield designated Clear Zone. The proposed use will also be adversely affected by the noise generated by aircraft at the Armed Forces Reserve Center. The subject property is located within the existing noise contour Zone II (65–75 dB (A)) which is normally considered unacceptable.

(4) The use does not meet all the required conditions and specifications set forth in the Zone where it is to be located, under

the P–M Zone Standards. The building is setback [sic] 53 feet from the rear property line while the Zoning Code currently requires that where rear yard adjoins a residential zone, said yard shall be a minimum of one hundred (100) feet. Furthermore, there is inadequate parking on the subject properties to accommodate the proposed church and fellowship hall. Some of the available off-street parking on adjacent lots is situated more than 300 feet from the buildings to be served and this is contrary to Section 22–19 of the Zoning Code.

(5) The proposed church and fellowship hall will have a significant adverse impact on surrounding land uses and will not be compatible with adjacent industrial and residential uses in that the setback problem referred to in four (4) above may cause negative impacts including, but not limited to noise, fumes, and traffic congestion. Industrial uses permitted on adjacent properties to the north may adversely impact the church operation and endanger the safety of the congregation.

The project site under consideration was designed, constructed, and intended for use as an industrial complex and the plot plan layout, design, off-street parking, and circulation are inadequate and inappropriate for a church facility.

(6) An analysis of the project's fiscal impact indicates the proposed church will have a negative impact on the City's financial base. An evaluation of sales tax sources indicates that significant revenues are derived from uses located in the P–M, Planned Light Industrial District. In addition, the proposed use would remove land and buildings from the property tax rolls. A recent analysis of the local economy indicates the City cannot afford the loss of income from sales tax subventions on this site and property tax—the two main sources of City revenues.

App. Exh. 23 at 133–34.

18. On February 6, 1990, the Executive Director of the Orange County Airport Land Use Commission ("ALUC"), George Britton, responded to a request from the City of Los Alamitos regarding the Grace Church application for a CUP.App. Exh. 16 at 114–15; 24 at 135–37. Mr. Britton first emphasized that his comments represented a "staff" position because the Commission as a body had not considered the project. Mr. Britton stated:

Given the project's location and proposed use, our preliminary analysis leads us to believe that the proposed church is an incompatible use. Our two specific concerns regarding this project are its location relative to the Armed Forces Reserve Center (AFRC) clear zones and its exposure to aircraft noise.

App. Exh. 24 at 135. Mr. Britton explained his concerns in greater detail:

... We are in the process of analyzing the AICUZ ourselves, but are still in the preliminary stages. Further, we understand that based on discussions, you have concluded that the clear zones may not be as depicted on the AICUZ maps. Whether or not the clear zone boundary actually encroaches into the project site, in staff's opinion it does not seem prudent to approve a 725 seat church, fellowship hall, nursery, classrooms and other ancillary uses so close to an area which by definition has the severe potential for loss of life and property due to accidents. With few exceptions only airport-related uses and open space use should be permitted in these areas. No buildings intended for human habitation are permitted.

*Id.* Mr. Britton concluded by stating, "State legislation governing ALUC activities clearly specifies that a city council has ultimate jurisdiction over the approval or denial of such a project." *Id.* at 137.

19. On February 7, 1990, Stephen Ellis, counsel for Grace Church, wrote to the City of Los Alamitos, through the Mayor and the City Council, addressing findings made by the Planning Commission on February 5, 1990. App. Exh. 25 at 138–45. In that letter, Mr. Ellis observed that:

Obviously, the site is beyond AFRC boundaries, and safety does not appear to be a problem.... [T]he site is closely proximate to the AFRC golf course area, which contains broad, uninhabited spaces ideally appropriate for emergency aircraft diversions or other emergency uses. Given

these factors, the safety concerns raised by the Planning Commission appear negligible. *Id.* at 141. The letter also addressed the projected "fiscal impact of the project," which Mr. Ellis characterized as "[t]he final, and perhaps most important, Planning Commission finding." *Id.* at 143.

20. On February 9, 1990, Lt. Col. Davies of the AFRC responded to a January 17, 1990 letter from Robert Kingsbury of Grace Church. App. Exh. 14 at 112; 28 at 150. The response letter included excerpts from the 1989 AICUZ Study. Lt. Col. Davies stated that:

> ... it is our opinion that [the Property] is outside the Los Alamitos Army Airfield's Clear Zone. This area, however, was part of the "Crash Zone" at some time when the airfield was owned and operated by the U.S. Navy. Although the site may be out of the Clear Zone, it is on the border. Therefore, careful consideration for occupancy by large groups of people must be given high priority. The site is however, located within "Noise Zone II" which is normally unacceptable use for housing, schools, churches, etc.—because of high noise impact.

App. Exh. 28 at 150.

21. On February 12, 1990, the Los Alamitos City Council met in regular session. App. Exh. 29 at 154. The City Council considered the appeal of the Planning Commission's denial of Grace Church's CUP application, and addressed the same issues that had been raised before the Planning Commission in January 1990. *Id.* at 154–282. In connection with the AFRC issues, Rev. Kingsbury of Grace Church commented "I think we're dealing with a very, very safe zone when you're outside of the clear zone." *Id.* at 229. One member of the City Council raised the concern that there might be future requests for CUPs for the remaining buildings on the Property with future expansion of Grace Church, and that such request might lead to rezoning the Property to a Community Facilities Zone. *Id.* at 161. Some discussions took place on referring the denial of a CUP to the ALUC for a recommendation. *Id.* at 163-64. The City Council concluded the meeting with a unanimously approved motion to continue the CUP to the February 26, 1990 meeting for the purpose of allowing the Partnership to express its willingness to refer the matter to the ALUC for a recommendation. *Id.* at 164.

22. Lt. Col. Davies appeared at the February 12, 1990 City Council meeting to furnish information regarding the 1989 AICUZ Study. Lt. Col. Davies stated:

> I would like to point out that our AICUZ Study does not tell anybody they can not use their property as they see fit. Since we don't own the property, we can't direct the property to be used in any particular way.
>
> . . .
>
> The location of the sites in question are very close to what we call our clear zone. And in fact, they were so close, in the beginning we thought they might have been within the clear zone. So at further review, we determined that the site was immediately outside of the clear zone. To go back on the question, the crash zone versus the clear zone, I believe those are synonymous terms.
>
> . . .

App. Exh. 29 at 188–89. Quoting from his February 9, 1990 letter to Rev. Kingsbury, Lt. Col. Davies stated:

> Although the site may be out of the clear zone, it is on the border. Therefore, careful consideration for occupancy by large groups of people must be given high priority. The site is however located within the Noise II Zone which is normally unacceptable use for housing, schools, churches, etc.—because of high noise impact.

*Id.* at 190.

23. On February 22, 1990, the City of Los Alamitos received a citizens' petition expressing opposition to the issuance of a CUP to Grace Church. App. Exh. 31 at 286–92. In the first three months of 1990, the City of Los Alamitos also received many letters from citizens expressing support for the issuance of a CUP to Grace Church. App. Exh. 54 at 382–448.

24. On February 22, 1990, Tom Allen, attorney to the City of Los Alamitos, prepared a memorandum indicating that he had received a telephone call from Sarabeth Davis in which she stated that she had authorized Grace Church to proceed in the CUP appeal and would allow the Church to participate in the referral of the matter to the ALUC.App. Exh. 33 at 294. As of February 23, 1990, the ALUC was planning to present the issue to its commissioners on March 15, 1990. *Id.* at 295. On February 23, 1990, counsel for Grace Church informed counsel for the City of Los Alamitos that Grace Church had obtained the Partnership's authorization to proceed with the hearing before the ALUC.App. Exh. 35 at 296.

25. On March 5, 1990, Lt. Col. Davies wrote to Plaintiff Robert Borders, stating that it was the opinion of the California Army National Guard "that the property and specifically buildings 9 and 10 . . . are outside the Clear Zone of the Los Alamitos Army Airfield." App. Exh. 38 at 302.

26. On March 13, 1990, counsel for the Partnership wrote to the ALUC, indicating that the Partnership had revoked the authority of Grace Church to proceed further with the application. App. Exh. 41 at 306. On the same date, counsel for the Partnership wrote to Robert Dunek, City Manager of Los Alamitos, informing him that the Partnership had revoked the authority of Grace Church to proceed further with the application for a CUP and with the matter before the ALUC. App. Exh. 42 at 307. Following receipt of these letters, Tom Allen, City Attorney, counseled the City of Los Alamitos to accept the revocation of authority as an abandonment of the application for a CUP and take no further action. App. Exh. 43 at 308–09.

27. On March 26, 1990, the Los Alamitos City Council met in regular session. App. Exh. 45 at 318. At that meeting, Sarabeth Davis explained that the Partnership had decided to withdraw its revocation of authority, and to allow Grace Church to proceed with the appeal process before the City Council. *Id.* at 319. The Partnership's attorney confirmed this position by letter dated March 27, 1990. App. Exh. 46 at 323.

28. On April 5, 1990, Grace Church sent a letter to the City of Los Alamitos, stating as follows:

In our pursuit of [CUP 325–89], Grace Church of Los Alamitos believes it has met and answered satisfactorily all the concerns put forth by the City Council, City Staff and City Planning Commission. We do not think however, that the City has given due consideration to our constitutional right to freely exercise our faith. Even if your concerns have validity they diminish when they are used to limit our free exercise of religion. Parking, traffic noise, conforming use, safety, fiscal impact, etc. must be weighed in light of all citizens['] first amendment rights.

App. Exh. 47 at 324.

29. On April 9, 1990, Karen Lee, an attorney for the Partnership, sent a letter to the City of Los Alamitos stating in pertinent part:

[I]n recent public hearings considering the application for use of portions of the property as a church, the City depicted the property as being within the airport clear zone for the Los Alamitos [A]irfield and has claimed that this location renders the property unsuitable for a use granted to others in similarly zoned property. Those accusations received widespread publicity. The City's representations are false and have led to distinct and predictable economic damage to our client. The truth is as stated in two recent letters received by our client from the Department of the Army. As confirmed by Mr. Virgil D. Taylor on March 20, 1990 and again on March 29, 1990:

"The Armed Forces Reserve Center has determined that [Los Caballeros Center] is outside the clear zone . . . Use of the property is a matter between you and the City of Los Alamitos."

"Your property is not in the clear zone."

It is patently clear that the City has created an alleged "safety" issue to avoid dealing with the applicant in a manner equal to the way in which it has treated others. . . .

This letter ... puts the City on notice that an attempt to "pass the buck" to another agency will only serve to aggravate the economic damage our client has already suffered.

App. Exh. 48 at 325–26.

30. At an April 9, 1990 meeting, the City Council addressed Grace Church's application for a CUP.App. Exh. 50 at 329–71. At the close of the meeting, a motion to uphold the Planning Commission's denial of the CUP and the denial of Grace Church's appeal passed with four votes in favor and one against. *Id.* at 339, 369.

31. On April 23, 1990, the City Council adopted Resolution 1320 with four votes in favor and none against. App. Exh. 52 at 374–77. The Resolution included six findings and reasons for the City Council's decision, repeating the same six findings of the Planning Commission's Resolution No. P.C. 519–89, dated February 5, 1990 (*see* Finding 17 above). *Id.* at 374–76.

32. Because the City Counsel denied the CUP, the condition of an escrow agreement between Grace Church and the Partnership failed, and Grace Church exercised its option not to buy the Property. Compl. ¶ 17.

32. On June 15, 1990, Maj. Gen. Robert C. Thrasher, Adjutant General of California, sent a letter to the Honorable Michael P. Stone, Secretary of the Army, raising concerns about the 1989 AICUZ Study. Pltfs' Opp. Exh. D. Maj. Gen. Thrasher referenced a May 25, 1990 meeting with Army staff, and questioned criteria used by the Army in establishing Clear Zones and Accident Potential Zones. He noted that "the Department of the Army has not yet implemented DOD Instructions 4165.57 (Part 256, Code of Federal Regulations) pertaining to Air Installation Compatible Use Zones[.]" *Id.* He also enclosed an August 11, 1983 State of California memorandum entitled "Waiver of Airfield Clear Zone Length," with 1st and 2nd Endorsements, and explained that "[b]ased on this correspondence, the Clear Zones for the Los Alamitos Army Airfield have been established at 1,000 feet. With the utilization of the 1,000 foot criteria, all land within the Clear Zones lies within the AFRC Los Alamitos installation boundaries." *Id.*

34. On July 31, 1990, Paul W. Johnson, Deputy Assistant Secretary of the Army, sent a letter to the City Manager of Los Alamitos explaining that the 1989 AICUZ Study was a "draft" in a "preliminary format," and "should not have been distributed to the public." Pltfs' Opp. Exh. E. Mr. Johnson stated that "the Department of the Army is taking steps to withdraw all copies previously distributed" and that "[t]he Army intends to review the study and modify the study as appropriate, and publish a revised draft." *Id.*

35. Nearly four years later, on June 1, 1994, the Office of the Adjutant General, California National Guard, issued a new AICUZ Study for the Los Alamitos Army Airfield ("1994 AICUZ Study" or "Study"). Supplemental Appendix in Support of Defendant's Motion for Summary Judgment ("Deft's Supp.App.") at 115–71. While using Air Force criteria for determining accident potential and clear zones, the 1994 AICUZ Study placed Plaintiffs' Property just outside the clear zone, as the 1989 AICUZ Study had done. *Id.* Figure 6.3–1. The 1994 AICUZ Study used the same clear zone widths—1,000 feet for Class A runways, and 3,000 feet for Class B runways—as had been used in the 1989 AICUZ Study, although the Los Alamitos Army Airfield requested "certain modifications to the normal AICUZ standards due to insufficient utilization of Class B aircraft." *Id.* at 124, Figure 6.3–1.

36. From September 11, 1989 through August 23, 1995, Plaintiffs received 16 documented offers to purchase portions of the Property. *See* Deft's Supp.App. Exh. A, B. There is no evidence that any of these offers contained any contingency relating to the location of the Property near the airfield's clear zone, or expressed any concern for public safety based upon the 1989 or 1994 AICUZ Studies. *Id.* Plaintiffs declined to pursue any of these offers for various reasons, including a desire to sell the entire development, rather than portions of it. *Id.* Exh. A, Davis Dep. at 96, 100–01.

37. On April 8, 1991, the Plaintiffs submitted a claim to the United States Army Claims Service for property damages pursu-

ant to 28 U.S.C. § 2675(a). Declaration of Burke S. Large ("Large Decl.") ¶ 4, Exh. 1. That claim, brought under the Federal Tort Claims Act, was denied by letter dated March 16, 1995. *Id.* Exh. 2. In denying that claim, the United States Army Claims Service indicated that the Plaintiffs' claims were for inverse condemnation. *Id.* The letter also indicated, as required by 32 C.F.R. § 536.11, that the Plaintiffs had six months from the date of its mailing within which to file a legal action in the appropriate U.S. District Court. *Id.* Plaintiffs did not file a legal action against the United States within six months of that denial. *Id.* ¶ 7.

38. On April 9, 1991, the Plaintiffs sued the City of Los Alamitos, the members of the Los Alamitos City Council and the Los Alamitos Planning Commission, claiming, *inter alia,* that:

> On or about April 23, 1990, Defendants denied the Conditional Use Permit to Grace Church, thereby denying it permission to operate its establishment of religion in the Subject Property, and preventing Plaintiffs from selling the Subject Property to Grace Church pursuant to the aforementioned sale contract, on the sole ground that Grace Church was a religious institution, in violation of the "free exercise" and "establishment of religion" clauses of the First Amendment to the Constitution of the United States and the "equal protection" and "due process" clauses of the Fourteenth Amendment to the Constitution of the United States.

App. Exh. 55 at 453–54. The Partnership also sued the City for a taking/inverse condemnation. *Id.* at 455–56. The Superior Court for the State of California, Orange County, dismissed this legal action on March 25, 1992. App. Exh. 56.

39. On August 30, 1995, Plaintiffs filed an action in the U.S. Court of Federal Claims, asserting that the Property had been taken in violation of the Fifth Amendment. *Davis v. United States,* Fed.Cl. No. 95–587L. The Court dismissed that action on April 24, 1996 for lack of subject matter jurisdiction. *Davis v. United States,* 35 Fed.Cl. 392 (1996) (Miller, J.)

40. In its opinion, the Court expressed sympathy for the Plaintiffs, and criticized the Government's "manipulation" of the Court's jurisdictional limits. The Court observed:

> Despite plaintiffs' jurisdictional difficulties, the court has sympathy for their plight. The procedural history of this case shows that the military effectively misled plaintiffs in this matter. Initially, plaintiffs filed a tort claim against the California Army National Guard under the Federal Tort Claims Act, seeking a final agency decision required under 28 U.S.C. § 2675(a) (1994). In its final decision of March 16, 1995, the United States Army Claims Service denied plaintiffs' tort claims, because, according to the Department of the Army, their claims amounted to a claim of inverse condemnation. The Army informed plaintiffs that "the Federal Government has waived sovereign immunity with respect to inverse condemnation cases," and that claims for inverse condemnation fall within the jurisdiction of the United States Court of Federal Claims, under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491(a)(1) (1994). However, after plaintiffs brought their action in the Court of Federal Claims, the Government, then represented by the Department of Justice, countered that the court lacked subject matter jurisdiction because their claims sound in tort.
>
> Congress created the court to afford individuals a forum to bring specific claims against the Government. While placing jurisdictional limits upon this court, Congress did not intend those jurisdictional limits to be manipulated to prevent a claimant from recovering compensation against the Government.... Nonetheless, the jurisdictional bar to plaintiffs' claim cannot be overlooked. The facts, as set forth in the amended complaint, state a tort claim beyond the jurisdiction of this court.

*Davis,* 35 Fed.Cl. at 395–96.

41. With regard to the Government's involvement in local land use issues, the Court stated:

> The Federal Government is not necessarily liable for local government action.

*Griggs v. Allegheny Cty.*, 369 U.S. 84, 89, 82 S.Ct. 531, 533–34, 7 L.Ed.2d 585 (1962). "[T]he Government can be held responsible for a Fifth Amendment taking only when its own regulatory activity is so extensive or intrusive as to amount to a taking. . . ." *De–Tom Enterprises, Inc. v. United States*, 213 Ct.Cl. 362, 365, 552 F.2d 337, 339 (1977). This court's predecessor has held that where the United States Armed Forces, as a landowner in the community, simply influences a local government's zoning decision, the Federal Government's conduct is not extensive or intrusive enough to constitute a taking under the Fifth Amendment. *Id.* In similar instances where an AICUZ study has impacted property, the court has refused to entertain a taking claim. *Blue v. United States*, 21 Cl.Ct. 359, 362 (1990) (citing cases); *see Stephens v. United States*, 11 Cl.Ct. 352, 363 (1986) (noting that AICUZ studies are advisory only and authority to regulate land use remains with local government. An AICUZ study, without more, cannot constitute a taking of private property.) *Davis*, 35 Fed.Cl. at 396.

42. On June 28, 2002, Chief Judge Edward J. Damich of the Court of Federal Claims received from the Clerk of the House of Representatives "a bill for the relief of Sarabeth M. Davis, Robert S. Borders, Victor Maron, Irving Burke, and Adele E. Conrad." H. Res. 103, 107th Congress (May 21, 2002), attaching H.R. 1258 (introduced March 27, 2001). The Clerk also enclosed House Report No. 107–444, dated May 7, 2002, explaining the background and history of the matter. In particular, the House Report noted the concerns expressed by the Court that the military had misled Plaintiffs, and that the "jurisdictional limits [had been] manipulated to prevent a claimant from recovering compensation against the Government." *Davis*, 35 Fed.Cl. at 395–96.

## II. *Contentions of the Parties*

Plaintiffs contend that they deserve equitable relief because the Department of the Army promulgated and disseminated the 1989 AICUZ Study in violation of applicable regulations. Plaintiffs assert that the wrongfully issued AICUZ Study caused unfounded public safety concerns due to the proximity of the Partnership's Property to the airfield's clear zone, and was a substantial factor in the Los Alamitos City Council's decision to deny a CUP to the Grace Church. Plaintiffs note that they previously have sought relief under the Federal Tort Claims Act, the Tucker Act, and the Military Claims Act, but were told at each turn that some other form of relief was more appropriate.

Defendant's motion for summary judgment is based upon Plaintiffs' failure to show any evidence of causation. Defendant contends that both the 1989 and 1994 AICUZ Studies accurately showed the Partnership's Property to be near the clear zone of the military airfield, and that the Department of the Army did nothing to cause the Los Alamitos City Council to deny a CUP to the Grace Church. Defendant notes that the City of Los Alamitos Planning Commission had conducted a public hearing and recommended denial of the CUP before the 1989 AICUZ Study had been distributed. To the extent that the Los Alamitos City Council considered the substance of the 1989 AICUZ Study in reaching its decision, the Study simply reflected accurate information regarding the proximity of the Property to the airfield, a fact of which Plaintiffs were aware when they acquired the Property in 1976.

## III. *Jurisdiction*

The Court of Federal Claims has jurisdiction over this matter pursuant to 28 U.S.C. § 1492, which provides that "[a]ny bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States Court of Federal Claims for a report in conformity with section 2509 of this title." The procedures governing Congressional reference cases are found in 28 U.S.C. § 2509, and in Appendix D of the Rules of the Court of Federal Claims ("RCFC"). The pertinent rules of the Court are to be applied in Congressional reference cases "insofar as," or "to the extent" feasible. 28 U.S.C. § 2509(b); RCFC, Appendix D, ¶ 1.

Under 28 U.S.C. § 2509(c), this Court is directed to "inform Congress whether the demand is a legal or equitable claim or

a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." A "legal claim" is defined as "a claim based on the invasion of a legal right that is 'one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" *Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 247 (1993). An "equitable claim" in the Congressional reference context "must rest on some unjustified governmental act that caused damage to the claimants." *Id.* at 250. The establishment of an equitable claim requires a finding of "a wrongful or negligent act" on the part of the Government. *See Banfi Products Corp. v. United States,* 40 Fed.Cl. 107, 121 (1997), *aff'd as modified,* 41 Fed.Cl. 581 (1998) (quoting *Menominee Indian Tribe of Wisconsin v. United States,* 39 Fed.Cl. 441, 458 (1997)). In contrast to legal and equitable claims are gratuities, which are grounded in conscience, ethics or morals, rather than in positive law. *See Banfi Prods. Corp.,* 40 Fed.Cl. at 122.

## IV. Discussion

### A. Use of Summary Judgment in a Congressional Reference Case

■ "Summary Judgment is a mechanism that may properly be used in a congressional reference [proceeding]." *J.L. Simmons Co., Inc. v. United States,* 60 Fed.Cl. 388, 390 n. 1 (2004) (citing RCFC, Appendix D, ¶ 1; *Barlow v. United States,* 51 Fed.Cl. 380, 392–93 (2001) ("Summary judgment may be properly used in a congressional reference.")). *See also Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial.").

In this case, Defendant filed a motion for summary judgment accompanied by a 17–page statement of proposed findings of uncontroverted fact. The parties submitted a stipulation regarding the authenticity and admissibility of a two-volume appendix of documents consisting of 56 tabs and 460 pages. With one exception, Plaintiffs did not object to Defendant's proposed findings of uncontroverted fact. Plaintiffs also submitted their own statement of proposed findings of uncontroverted fact, which in some instances supplement, but are not in conflict with, Defendant's proposed findings. All of the proposed findings submitted by the parties are based upon the stipulated documents or sworn deposition testimony. The Hearing Officer is satisfied that the material facts are not in dispute, and that the matter can be resolved without taking further evidence.

### B. Analysis of Plaintiffs' Claims

■ As noted in the Findings of Fact, ¶¶ 37, 39, Plaintiffs previously have asserted legal claims against the United States before the U.S. Army Claims Service and before this Court on the same facts now alleged in support of Plaintiffs' case. Plaintiffs, however, are foreclosed from relitigating legal claims in a Congressional reference case. As our Court has stated succinctly, "[a] congressional reference case ... cannot reconsider legal claims made and rejected in prior litigation." *Menominee Indian Tribe,* 39 Fed.Cl. at 459 (quoting *Sea–Gate, Inc. v. United States,* 4 Cl.Ct. 25, 30 (1983)).

The same is not so with respect to equitable claims. In contrast to legal claims, equitable claims in Congressional reference cases are not foreclosed even by sovereign immunity defenses. *J.L. Simmons,* 60 Fed.Cl. at 394. "[I]n order to recover on an equitable claim, the plaintiff must show two things: that 'the government committed a negligent or wrongful act' and that 'this act caused damage to the claimant.'" *Id.* (quoting *Cal. Canners & Growers Assoc. v. United States,* 9 Cl.Ct. 774, 785 (1986)).

■ The wrongful or negligent conduct forming the basis of an equitable claim must entail "more than a mere error or questionable exercise of government discretion; rather, there must be some violation of a standard of conduct established by statute or regulation or a recognized rule of common law, and that violation must damage the claimant." *Id. See also Menominee Indian Tribe,* 39 Fed.Cl. at 458 (holding that "for the

plaintiff to have an equitable claim against the Government, the Government must have had a duty to the plaintiff and must have breached that duty by committing a wrongful or negligent act that caused the [plaintiff] damage."). The burden of proving the existence of a duty, the breach of that duty, and causation with respect to damages, is on the plaintiff. *See J.L. Simmons,* 60 Fed.Cl. at 394–95 (citing *INSLAW, Inc. v. United States,* 40 Fed.Cl. 843, 858 (1998)).

In pursuing their claims, the Plaintiffs have asserted every imaginable theory of recovery. In the course of the permit proceedings, Plaintiffs argued to the City of Los Alamitos that the real reason behind the permit denial was the perceived loss of tax revenue. (Finding 16). Plaintiffs also argued that the permit denial violated the "free exercise" and "establishment of religion" clauses of the First Amendment. (Findings 28, 38). Plaintiffs sued the City of Los Alamitos for a taking and inverse condemnation. (Finding 38). Plaintiffs asserted a claim for property damages against the United States under the Federal Tort Claims Act. (Finding 37). Plaintiffs then sued the United States in this Court under the Tucker Act for a taking in violation of the Fifth Amendment. (Finding 39). In dismissing for lack of subject matter jurisdiction, this Court noted that Plaintiffs' cause of action perhaps was the tort of "slander of title." *Davis,* 35 Fed.Cl. at 395.

Regardless of which legal theory is employed, the fundamental problem with Plaintiffs' case is the inability to show any causation of damages. The most that can be said of the 1989 AICUZ Study is that the Department of the Army distributed the report on January 29, 1990 as a final document (Finding 10), but then withdrew the report on July 31, 1990. (Finding 34). In withdrawing the 1989 AICUZ Study, the Army characterized the report as a "draft" in a "preliminary format" that "should not have been distributed to the public." *Id.* By withdrawing the previously issued "final report," the Army

seemingly conceded that its issuance was an error. Assuming it was an error, the question becomes whether that error caused any damage to Plaintiffs. The Court concludes that it did not.

Indeed, the Los Alamitos City Council, not the United States, made the decision to deny the CUP to Grace Church. The City's Planning Commission Staff was well along in recommending denial of the CUP *before the 1989 AICUZ Study was even issued.* (Findings 8, 9). By the AICUZ issue date of January 29, 1990, the Planning Commission already had prepared a January 15, 1990 comprehensive report recommending that the CUP be denied. (Finding 8, 10).[5] Without any benefit of the AICUZ Study, the Planning Commission Staff observed that the Property "is located just within the crash hazard zone." App. Exh. 11 at 94. The Planning Commission held a public hearing on January 15, 1990. Again without the benefit of the AICUZ Study, the hearing participants knew of the Property's proximity to the military airfield. App. Exh. 13 at 102–03. The Planning Commission voted to deny the CUP, four votes in favor and one abstention, without any information from the AICUZ Study.

On February 5, 1990, one week after the AICUZ Study had been distributed, the Planning Commission adopted Resolution No. 519–89 denying the CUP application, four votes in favor and one abstention. (Finding 17). The Planning Commission cited six detailed findings in support of the Resolution. *Id.* Among its conclusions, the Planning Commission found that:

> The use may endanger the public health or safety if located where proposed because the church facility will be impacted by noise and hazards created by operations at the adjacent Armed Forces Reserve Center. A high occupancy use at this location, such as the proposed 725–seat church and assembly hall/classroom building, may jeopardize the safety of the building occu-

---

**5.** On January 15, 1990, the staff of the City of Los Alamitos Planning Commission prepared a report recommending denial of Grace Church's application for a CUP. (Finding 8). On January 29, 1990, Lt. Col. William J. Davies of the Cali-

fornia Army National Guard furnished to the City Manager of Los Alamitos a copy of the Army's 1989 Air Installation Compatible Use Zone ("AICUZ") Study. (Finding 10).

pants because the facility is situated in very close proximity to the Los Alamitos Army Airfield designated Clear Zone. The proposed use will also be adversely affected by the noise generated by aircraft at the Armed Forces Reserve Center. The subject property is located within the existing noise contour Zone II (65–75 dB (A)) which is normally considered unacceptable.

*Id.* Thus, despite the absence of any reference to the AICUZ Study in the Planning Commission's findings, it was well aware of the perceived risks of locating a church near the military airfield.

The 1989 AICUZ Study merely confirmed what Plaintiffs and the Planning Commission already knew. The report showed that Plaintiffs' Property was near the crash zone, but not within it. (Finding 10). When Lt. Col. Davies appeared at the February 12, 1990 City Council meeting to explain the AICUZ Study, he correctly stated that "our AICUZ Study does not tell anybody they cannot use their property as they see fit." (Finding 22). He then observed that "[a]lthough the site may be out of the clear zone, it is on the border," and that "[t]herefore, careful consideration for occupancy by large groups of people must be given high priority." *Id.*

Later, on March 5, 1990, Lt. Col. Davies wrote to Plaintiff Robert Borders, explaining that "it is our opinion that the property and specifically buildings 9 and 10 . . . are outside the Clear Zone of the Los Alamitos Army Airfield." (Finding 25). The statements of Lt. Col. Davies before the City Council and to Mr. Borders were accurate, and did not violate any duty owed to Plaintiffs.

On April 23, 1990, when the City Council voted to deny Grace Church's application for a CUP, it adopted Resolution 1320 with four votes in favor and none against. (Finding 31). This Resolution adopted in whole the Planning Commission's earlier February 5, 1990 resolution, and made no mention of the AICUZ Study. *Id.*

After the Army withdrew the 1989 AICUZ Study as a "draft" in "preliminary format," that "should not have been distributed to the public" (Finding 34), the Army's new AICUZ Study issued in June 1994 showed the aircraft clear zone in *exactly the same place* near Plaintiffs' Property. (Finding 35). Although the Army withdrew the 1989 Study, it cannot be said with respect to Plaintiffs' Property that there was any inaccurate information in the 1989 Study, or that the 1994 Study corrected any information material to Plaintiffs. The fact remained, as it had before any AICUZ Study, that Plaintiffs' Property was near the airfield.[6] The City of Los Alamitos Planning Commission, and the City Council, had always viewed the close proximity of the Property to the airfield as a public safety concern, and as one reason among many for denying the CUP. The actions of the United States had no effect on the City's review and decision on the Grace Church's permit application.

The record supports a conclusion that Grace Church was prepared to purchase the Property from Plaintiffs if it could obtain a CUP from the City of Los Alamitos. Grace Church regarded the Property as safe and desirable notwithstanding its proximity to the airfield and the contents of the 1989 AICUZ Study. App. Exh. 25 at 141; App. Exh. 47. The denial of the CUP by the City of Los Alamitos thus appears to be the only reason that Grace Church did not purchase Plaintiffs' Property.

The record also reveals that, from 1989 through 1995, Plaintiffs received 16 documented offers to purchase portions of the Property. (Finding 36). There is no evidence that any of these offers contained any contingency relating to the location of the Property near the airfield's clear zone, or expressed any concern for public safety based upon the 1989 AICUZ Study. *Id.* Plaintiffs declined to pursue any of these offers for various reasons, including a desire to sell the entire development, rather than portions of it. *Id.*

---

**6.** The only material difference between the two studies is that the clear zone in the 1994 AICUZ report lay entirely within the boundaries of the Base, whereas the clear zone in the 1989 AICUZ report extended into certain private property. Plaintiffs' Property was not among those properties included in the clear zone of the 1989 report.

Our Court has observed that "AICUZ studies are for advisory purposes only." *Blue v. United States,* 21 Cl.Ct. 359, 362 (1990). The United States, "as a substantial, interested landowner, can participate in proceedings at the state and local level just as would any other property owner." *Id.* (citing *De–Tom Enters., Inc. v. United States,* 213 Ct.Cl. 362, 552 F.2d 337 (1977) (per curiam) (no taking by United States where it acted as an influential local landowner and successfully opposed zoning change that would have permitted plaintiff's proposed high-density residential development)). "The authority to permit or restrict development or use of private lands is left to the local jurisdiction." *Id.* (citing *Stephens v. United States,* 11 Cl. Ct. 352, 363 (1986)).

In *Blue v. United States,* 21 Cl.Ct. 359, the owners of land adjacent to a naval air station brought suit against the Government based upon the Navy's participation in the passage of a county's comprehensive zoning ordinance. Navy personnel "actively participated in public hearings and workshops" over a two-year period in developing the ordinance. *Id.* at 360. The Navy issued an AICUZ Study, submitted its own drafts of the ordinance, and met with county staff to discuss the proposed ordinance. *Id.* at 360–61. When the county adopted the ordinance with assistance from the Navy, the plaintiffs were precluded from constructing a planned high-density waterfront development. The Court determined that plaintiffs had failed to state a takings claim, observing that: "[t]he County is the ordinance adopting governmental entity. The County was free to reject all or part of the Navy's recommendations." *Id.* at 362. The Court further stated that "[t]he United States cannot be held liable if private property is taken by the action of the state or local government entity." *Id.*

Similarly, in *De–Tom Enters.,* 213 Ct.Cl. 362, 552 F.2d 337, plaintiff unsuccessfully sought a zoning change that would have permitted it to develop its property near an Air Force Base for high density residential purposes. *Id.* at 340–41. The Air Force opposed the zoning change, asserting that plaintiff's proposed development would lead to air noise complaints that might compel the Base to curtail or cease certain operations. The Air Force maintained that "the 'encroachment' of high density residential development on the property would be incompatible with the continued use of the [base] for military operations at the then-current level." *Id.* at 341. Significantly, the Court observed that "[t]he evidence in the record warrants the inference that if the Air Force had not opposed the plaintiff's application for a change of zoning, the application would have been approved by the [local authority]." *Id.* at 342. Even at this level of governmental intervention, the Court still held that the local agency was responsible for the final zoning change, and that the United States only served as an "influential affected landowner" trying to persuade the county to accept its position. *Id.* at 339–40. *Blue* and *De–Tom* both involved federal action far more intrusive than is involved here, yet our Court found in both instances that the local entity was legally responsible for making the determination alleged to have injured the plaintiffs.

In summary, Plaintiffs knew in 1976 when they acquired the Property that it was near a military airfield. The City of Los Alamitos, a local governmental entity, denied Grace Church's application for a CUP for the following stated reasons: (1) the impact of church ownership on the City's tax revenue base; (2) the lack of adequate parking; (3) the lack of compatibility between a church use and the adjacent light industrial and residential uses; (4) perceived public health and safety concerns (noise, fumes, proximity to the clear zone) stemming from the location of the Property; and (5) the lack of an adequate setback from the rear property line. The City Planning Commission identified and knew of these issues before the Army issued the 1989 AICUZ Study. Once issued on January 29, 1990, the AICUZ Study did not provide any new or inaccurate information relevant to the consideration of a CUP for Plaintiffs' Property.

The Court appreciates the unfortunate manner in which Plaintiffs may have been wrongly encouraged to pursue their claim in a different forum or under a different legal theory of recovery. The U.S. Army, in de-

nying the Federal Tort Claims Act action, suggested that Plaintiffs assert an "inverse condemnation" theory in the U.S. Court of Federal Claims. After filing such an action in this Court, the Department of Justice moved to dismiss the action for lack of subject matter jurisdiction. The Court lamented the Government's "manipulation" of jurisdictional rules, but felt constrained to dismiss the action. *Davis,* 35 Fed.Cl. at 396–97. Recognizing the same, the Secretary of the Army informed Congressman Christopher Cox in a July 21, 2001 letter "I believe this may be an instance where private relief legislation is appropriate." Pltfs' Opp. Exh. A.

It does not appear, however, that any of the government officials who suggested alternate forums or theories to Plaintiffs ever examined the issue of whether the United States caused Plaintiffs any damages. Had anyone carefully reviewed the underlying facts of this matter, it would have been apparent that causation was lacking. While any false encouragement is regrettable, it should also be noted that Plaintiffs had legal counsel at every step through this journey, who presumably counseled Plaintiffs on the merits of their claim. The Hearing Officer simply cannot find a basis for any equitable claim in Plaintiffs' behalf.

### Conclusion

Based upon the foregoing, the Hearing Officer finds that Plaintiffs do not have a legal or equitable claim against the United States, and that any award therefore would be a gratuity.

